**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ROBERT G. MOYA,

      Plaintiff,

v.                                        Civ. No. 18-494 GBW/KRS

CITY OF CLOVIS, *et al.*,

      Defendants.

## ORDER GRANTING DEFENDANTS' 
## MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants' Motion for Summary

Judgment. *Doc. 56.* Having reviewed the Motion and the attendant briefing (*docs. 56,

62, 65*), and being otherwise fully advised regarding relevant case law, the Court

GRANTS Defendants' motion.

### I.    PROCEDURAL POSTURE

This case stems from events occurring on May 29, 2015, in Clovis, New Mexico.

*See generally doc. 27.* Plaintiff sustained injuries when he was bitten by a police dog

following a chase by officers of the Clovis Police Department ("CPD") through a

residential neighborhood. Plaintiff filed an amended complaint against Defendants on

September 19, 2018, asserting claims under 42 U.S.C. § 1983 and the Fourth and

Fourteenth Amendments. Plaintiff asserts that Defendant Officer Brent Aguilar used

excessive force against him in violation of his Fourth Amendment rights by allowing his

police dog, Leo, to attack him.  He asserts that Defendant Sergeant James "Chet" Gurule violated his Fourth Amendment rights by failing to intervene against Defendant Aguilar's use of excessive force.  Finally, he asserts that the Defendant City of Clovis is liable for CPD's failure to train and supervise those officers amounting to a deliberate indifference to the constitutional rights of individuals.

On August 21, 2019, Defendants filed a Motion for Summary Judgment, which was fully briefed on October 15, 2019.  *Docs. 56, 62, 65.*  In the Motion, Defendants seek summary judgment on each of Plaintiff's claims on the grounds that the individual Defendants are entitled to qualified immunity and that none of the Defendants committed a constitutional violation against Plaintiff.  *See generally doc. 56.*

## II.      LEGAL STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

Notably, however, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)). This is a "strict two-part test" that must be met before the defendant asserting qualified immunity again "bear[s] the traditional burden of the movant for summary judgment— showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)) (internal quotations omitted). The Court may address the two prongs of the test in any order. *Pearson*, 555 U.S. at 236.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quotation omitted). While it is not necessary to identify a case with identical facts, "existing precedent must have placed

the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). General principles "do not by themselves create clearly established law outside 'an obvious case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). The test is whether the "right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

In determining whether the plaintiff has met its burden to overcome a qualified immunity defense, the Court construes the facts in the light most favorable to the plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 377 (2007). In so doing, the Court must keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). Second, the Court must resolve

all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–54 (1999). Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257. Nonetheless, at the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

## III.   UNDISPUTED FACTS

Based on the facts presented by the movants and other facts gleaned from the record, the Court finds the following facts to be undisputed for the purposes of Defendants' Motion:

1.      Prior to May 29, 2015, Plaintiff had an extensive history of interactions with the CPD, engaging in what Plaintiff describes as "cat-and-mouse" chases, in which Plaintiff frequently managed to evade officers. UMF 2;[1] *doc. 56-1* at 22:4–22:19, 26:3–11; *doc. 56-6*. Plaintiff also has an extensive criminal record including absconding and a record of probation violations including a failure to report to probation. UMF 1; *doc. 56-1* at 14:11–19, 16:4–6.

2.      On the afternoon of May 29, 2015, Plaintiff was spotted by CPD Detective Adriana Munoz, who recognized Plaintiff from prior investigations. UMF 6; *doc. 56-2*;

---

[1] The citation "UMF __" refers to the respective Undisputed Material Fact listed in *doc. 56*.

*doc. 56-1* at 26:3–11.  Detective Munoz called dispatch and learned that Plaintiff had two

outstanding warrants.  UMF 9; RUMF 9;[2] *Ddoc. 56-2*.  The first warrant was for a

probation violation, stemming from Plaintiff's failure to report to the probation officer

following his release from prison.  *Doc. 56-2*; *doc. 56-1* at 33:2–34:3.  The second warrant

was for a failure to appear on a separate charge.[3]  *Id*.

3.      Upon receiving confirmation of outstanding warrants, Detective Munoz turned

her car around and activated her emergency equipment.  UMF 7; *doc. 56-2*.  Knowing

that he had at least one outstanding warrant, Plaintiff began to flee.  UMF 6; *doc. 56-1* at

32:17–33:19.

4.      Defendants Gurule and Aguilar responded to Detective Munoz's request for

backup.  UMF 8; *doc. 56-3*; *Doc. 56-4* at 3.  Defendant Aguilar was accompanied by his

police dog, Leo.  UMF 8; *doc. 56-3*.

5.      Prior to May 29, 2015, Defendant Aguilar and Leo attended a 200-hour dual

---

[2] The citation "RUMF __" refers to the Plaintiff's response to the respective Undisputed Material Fact as found in *doc. 62*.

[3] The second warrant was reported by Detective Munoz as "Failure to Appear stemming from a larceny charge."  *Doc. 56-2*.  According to Defendant Officer Brent Aguilar, however, the failure to appear stemmed from a charge for aggravated battery.  *Doc. 56-3*; *doc. 65-1* at 29:20–30:1.  Throughout their briefs, Defendants rely heavily on the existence of a warrant relating to a violent crime to argue that Plaintiff posed an immediate threat to the safety of officers and the community.  *See generally doc. 56*, *doc. 65*. However, the discrepancy in Detective Munoz's report is left unexplained and no party has pointed to evidence firmly establishing the nature of the charge reported by dispatch on May 29, 2015.  Moreover, Defendant Aguilar's lapel video shows that *he* confirmed the warrants *after* Plaintiff was apprehended. Defs.' Reply, Ex. B ("Lapel Video") at 6:59:06–6:59:24.  While it is possible that Defendant Aguilar also confirmed the warrants before pursuing Plaintiff, the after-the-fact confirmation raises a genuine dispute as to what Defendant Aguilar believed about the threat posed by Plaintiff based on his outstanding warrants at the time he released Leo.

purpose school, which provided training in apprehending suspects. *Doc. 56-3.*

6.    The CPD has maintained a policy for use of police service dogs such as Leo since at least 2010.  UMF 14; RUMF 14; *doc. 56-5.*  Under this policy, police service dogs are used "to facilitate the capture of suspects with the least amount of injury to either the officers involved, the public, or the suspect."  *Doc. 56-5* at 1.  The policy outlines procedures for, *inter alia*, issuing verbal warnings when using a dog, *id.* at 6, deciding when to release a dog to apprehend a suspect, *id.* at 9, and reporting bites or injuries resulting from the dog, *id.* at 12.

7.    Before beginning their search for Plaintiff, Defendant Aguilar made two verbal announcements, warning Plaintiff to surrender or the dog would be released and would bite him.  *Doc. 56-3*; Lapel Video at 6:51:46–6:52:04.  Defendant Aguilar then gave Leo the command to begin searching, Leo was not yet released.  *Doc. 56-3.*

8.    Leo pulled Defendant Aguilar into an alley behind Ross Street and began concentrating on a wall separating the pair from the backyard of 608 Ross Street.  *Doc. 56-3*; *doc. 56-1* at 53:1–10.  Around that time, Plaintiff was standing on a shed in the backyard of 608 Ross Street.  *Doc. 56-1* at 48:22–49:24.

9.    Defendant Aguilar gave three verbal warnings and Defendant Gurule gave two verbal warnings to surrender or the dog would be released and would bite Plaintiff.

UMF 10;[4] Lapel Video at 6:52:37–6:52:52; *doc. 56-3.* Plaintiff heard and understood

Defendants' warnings. UMF 11; *doc. 56-1* at 52:17–18.

10.     Plaintiff got down from the shed into the backyard of 608 Ross Street. UMF 11;

*doc. 56-4* at 1; *doc. 56-1* at 49:22–50:5; Lapel Video at 6:52:53–6:52:54. Instead of indicating

in any fashion that he was surrendering, he turned and began to run away. UMF 10, 11,

12; *Court's Exhibit 1* (freeze frame of Lapel Video at 6:52:55).[5] Defendant Aguilar

released Leo and helped Leo over the wall into the backyard of 608 Ross Street. *Doc. 56-*

*4* at 1; *doc. 56-1* at 49:22–50:5; Lapel Video at 6:52:55–6:52:57.

11.     While Defendant Aguilar helped Leo across the wall, Defendant Gurule left the

alley to cut Plaintiff off in the front yard of 608 Ross Street. *Doc. 56-4* at 3.

12.     Defendant Aguilar immediately followed Leo over the wall and across the yard,

as Plaintiff pulled himself onto the roof of a building on an adjoining property. *Doc. 56-*

*4* at 1; *doc. 56-1* at 53:16–18; Lapel Video at 6:52:57–6:53:00. As Plaintiff climbed away,

Leo made brief contact with Plaintiff's leg. *Doc. 56-4* at 1–2; *doc. 56-1* at 56:10–14.

---

[4] Plaintiff indicates that he disputes UMF 10, but he does not dispute that the commands were given, heard, or understood. *See* RUMF 10, 11.

[5] Plaintiff expresses some dispute with UMF 10-12. *See* RUMF 10-12. He claims that "he jumped of [sic] the shed in order to stop and get down as instructed, but saw an officer pull a firearm and saw the dog being pushed over the fence by Defendant Aguilar despite the fact that he was attempting to surrender and became fearful of being physically harmed." RUMF 10. He also claims that "he started to surrender but saw Defendant Aguilar release the dog to attack him even though he was attempting to follow the officers' orders." RUMF 11. To the extent that Plaintiff claims he made any indication of surrender prior to Leo being released, the video evidence contradicts his claim. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007). While the view from Defendant Aguilar's lapel video is partially obscured by Leo as Plaintiff comes into frame after jumping from the roof of the shed, Plaintiff never pauses to surrender but instead is clearly seen running away prior to Leo being released. Lapel Video at 6:52:54–6:52:56; *Court's Exhibit 1* (freeze frame of Lapel Video at 6:52:55).

13.      After escaping from Leo and while on top of the building's roof, Plaintiff was safe from the police dog and was, of course, aware that the dog was tracking him.  UMF 12. Nonetheless, Plaintiff decided to leave the roof and continue fleeing.  *Doc. 56-1* at 58:10–15.  Plaintiff jumped down from the building and began throwing things and running. *Id.* at 58:16–24.

14.      Meanwhile, Defendant Aguilar attempted to leave the backyard of 608 Ross Street through a gate when Leo jumped the wall separating the two properties.  *Doc. 56-7* at 37:3–9; Lapel Video at 6:53:01–6:53:20.  Defendant Aguilar then followed Leo over the wall into the backyard of the adjoining property.  *Doc. 56-7* at 37:3–9; Lapel Video at 6:53:17–6:53:28.

15.      Leo was out of Defendant Aguilar's sight for less than ten seconds.  Lapel Video at 6:53:20–6:53:29.  Defendant Aguilar found Plaintiff lying face down on the ground with Leo biting and holding Plaintiff by the left arm.  *Doc. 56-7* at 37:3–9; Lapel Video at 6:53:22–6:53:29.  Defendant Aguilar approached Leo and held onto him while other officers arrived to place handcuffs on Plaintiff, at which point Defendant Aguilar commanded Leo to release Plaintiff.  *Doc. 56-7* at 38:18–20; Lapel Video at 6:53:30–6:53:40.  Therefore, the bite lasted no longer than twenty seconds in total and no longer than ten seconds once Defendant Aguilar first laid hands on Plaintiff.  Lapel Video at 6:53:20–6:53:40.  Leo was not permitted to continue biting Plaintiff at all once Plaintiff had been handcuffed.  Lapel Video at 6:53:39–6:54:00.

16.     An ambulance was called to obtain medical care for Plaintiff.  *Doc. 56-4* at 2.

Plaintiff received several abrasions on his left shoulder and deep puncture wounds on

his left arm from Leo's apprehension.  *Id.*; *doc. 62-5*.  Plaintiff also received a laceration to

the right side of his head.  *Doc. 56-4* at 2; *doc. 62-5*; *doc. 56-1* at 69:15–17.

## IV.   ANALYSIS

### A. Defendant Aguilar Is Entitled to Summary Judgment Because Plaintiff Has Not Established that Defendant Aguilar Used Unconstitutionally Excessive Force.

The parties argue over whether Defendant Aguilar's actions constituted excessive

force under *Graham v. Connor*, 490 U.S. 386 (1989).  In *Graham*, the Supreme Court laid

out an objective test for determining whether an officer's use of force constitutes an

unreasonable seizure under the Fourth Amendment.  *Id.* at 397.  "The 'reasonableness'

of a particular use of force must be judged from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.  The inquiry

must make allowances "for the fact that police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—

about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

Factors for consideration are "the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396; *see also Pauly*

*v. White*, 874 F.3d 1197 (10th Cir. 2017) (applying *Graham*).  *Graham* thus sets forth

general principles for assessing the use of force by police officers, although cases with closely analogous facts are necessary to fill out the contours of the constitutional right. *See Kisela*, 138 S. Ct. at 1153 ("[T]he general rules set forth in … *Graham* do not by themselves create clearly established law outside an 'obvious case.'") (quotation marks and citation omitted).

In several police dog cases from across the circuits, it is frequently the case that the third *Graham* factor (actively resisting or evading arrest) is present. *See, e.g., Thomson*, 584 F.3d at 1317. Police departments commonly deploy police dogs to aid in apprehension of fleeing suspects, using a "bite and hold" technique. *See, e.g., Jarrett v. Town of Yarmouth*, 331 F.3d 140, 143 (1st Cir. 2003). An overarching consideration in these cases is whether officers gave a verbal warning before releasing the dog. *Kuha v. City of Minnetonka*, 365 F.3d 590, 599 (8th Cir. 2003), *abrogated on other grounds by Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007) ("[T]he presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog."); *Jarrett*, 331 F.3d at 148 (finding as a relevant fact that the officer issued three verbal warnings before releasing the dog); *cf. Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (some warning should be given, if feasible, prior to use of deadly force). The failure to give any warning at all has been found to be objectively unreasonable. *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 179 (4th Cir. 1998); *Kuha*, 365 F.3d at 599 (observing that a warning "would likely diminish the risk of confrontation by increasing the likelihood

that a suspect will surrender"). Moreover, the fact that a suspect continues fleeing or refuses to come out of hiding after a warning is given supports the reasonableness of deploying a police dog. *See, e.g., Marquez v. City of Albuquerque*, 399 F.3d 1216, 1221 (10th Cir. 2005) (finding that a jury could reasonably conclude that the officer "acted reasonably when, after warning Marquez to halt, he ordered his police service dog to apprehend Marquez"); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *Matthews v. Jones*, 35 F.3d 1046, 1051 (6th Cir. 1994).

With or without a warning, deploying a police dog may be objectively reasonable where the second *Graham* factor is present: an immediate threat to the safety of officers and the community. *Thomson*, 584 F.3d at 1317; *Marquez*, 399 F.3d at 1221; *Estate of Rodgers v. Smith*, 188 F. App'x 175, 181–82 (4th Cir. 2006) (unpublished) (no Fourth Amendment violation despite lack of warning). The second *Graham* factor "is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1216 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Relevant facts for assessing the threat posed by the suspect include the nature of the crime involved (i.e., whether it was violent), whether the suspect is believed to be armed, and the suspect's conduct during the chase. *See Marquez*, 399 F.3d at 1221 (potentially armed suspects in a burglary led police in a reckless high-speed chase); *Thomson*, 584 F.3d at 1309–10 (plaintiff had threatened his wife and was known to be armed); *Estate of Rodgers*, 188 F. App'x at 181–

82 (plaintiff kidnapped girlfriend at gunpoint, led police on a high-speed chase, and was armed when officers approached him); *Johnson v. Scott*, 576 F.3d 658, 659, 661 (7th Cir. 2009) (plaintiff led officers on a high speed chase over icy roads); *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994) (no summary judgment for officers who had no reason to think plaintiff was armed and no knowledge that outstanding felony warrants related to violent crimes). Additionally, erratic conduct by the suspect may put officers on guard for their safety. *Jarrett*, 331 F.3d at 150; *Kuha*, 365 F.3d at 600 (suspect's "inexplicable flight from a minor traffic stop" through swamp made officers "reasonably wary").

A distinct but related inquiry in police dog cases is the danger of the pursuit of the suspect, and not just the threat posed by the suspect himself. A police dog is often a safer way of apprehending a suspect than other, more lethal methods such as firearms. *Thomson*, 584 F.3d at 1316. Where the search for a suspect is conducted in a residential neighborhood or a dark and unfamiliar area, police dogs can apprehend a suspect with minimal danger to officers or bystanders. *Id.*; *Robinette v. Barnes*, 854 F.2d 909, 914 (6th Cir. 1988) (releasing dog in unlit and unfamiliar building at night was safer than using firearms); *Jarrett*, 331 F.3d at 149–50 (chase through residential neighborhood); *Mendoza*, 27 F.3d at 1362 (hiding on private property); *Kuha*, 365 F.3d at 600 (swamp near apartment buildings at a time when residents would be leaving for work); *compare with Chew*, 27 F.3d at 1443 (plaintiff hiding in "scrapyard for two uneventful hours" did not necessitate mauling by police dog).

Although the Tenth Circuit has not yet addressed this factor, several other circuits consider the duration of the dog bite as another relevant factor.  *See, e.g., Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) ("excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force").  There is no exact duration that is considered reasonable, but dog bites lasting less than a minute are often found objectively reasonable while dog bites continuing for one or more minutes are often found objectively unreasonable.  *Compare Kuha*, 365 F.3d at 601 (ten to fifteen seconds while officers caught up to dog and confirmed no weapons in suspect's reach); *Maney v. Garrison*, 681 F. App'x 210, 218 (4th Cir. 2017) (eight seconds was objectively reasonable); *and Miller v. Clark Cty.*, 340 F.3d 959, 962, 967 (9th Cir. 2003) (up to sixty seconds was "an unusually long bite duration" but reasonably necessary in the circumstances) *with Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (attack lasting as long as two minutes was excessive force); *Cooper v. Brown*, 844 F.3d 517, 521 (5th Cir. 2016) (excessive force to allow dog to continue biting nonresisting suspect for one to two minutes); *and Becker v. Elfreich*, 821 F.3d 920, 929 & n.2 (7th Cir. 2016) (up to three minutes).

More important than the exact duration, however, is whether the dog bite begins or continues after the suspect has been subdued.  *See Priester*, 208 F.3d at 923, 927 ("no particularized preexisting case law was necessary" to find constitutional violation where dog was deployed after suspect surrendered and laid on the ground); *Cooper*, 844

F.3d at 524 (case law clearly established that "once an arrestee stops resisting, the degree of force an officer can employ is reduced"); *Griggs v. Wash. Metropolitan Area Transit Auth.*, 232 F.3d 917, 922 (D.C. Cir. 2000) (no immunity for officer who allowed police dog to continue attacking plaintiff after surrender). On the other hand, it is not unreasonable for an officer to delay calling off the dog until the officer can confirm that the suspect is fully subdued. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (no more than five or ten seconds after suspect was in handcuffs was reasonable); *Miller*, 340 F.3d at 961 (forty-five to sixty seconds in which officer caught up to suspect after releasing dog); *Kuha*, 365 F.3d at 601 (reasonable to allow bite to continue while officers confirmed no weapons in suspect's reach).

    With these standards in mind, the material undisputed facts in the instant case are as follows: (1) Prior to the incident on May 29, 2015, Plaintiff had a long history of fleeing and escaping from the police as well as failing to appear on pending charges. (2) Plaintiff was not armed. (3) Plaintiff fled the police in an encounter that occurred in a residential neighborhood during the daytime, jumping into private yards and onto roofs to evade capture. (4) Defendant Aguilar gave five verbal warnings and Defendant Gurule gave two verbal warnings to surrender or the dog would be released, and Plaintiff heard the warnings. (5) Plaintiff did not surrender prior to the release of Leo. (6) After Leo was released, Plaintiff reached a place safe from Leo, but chose to continue his flight which again placed him within Leo's reach. (7) Leo apprehended Plaintiff and

bit him for no more than twenty seconds until officers arrived and placed Plaintiff in handcuffs.  (8) As soon as Plaintiff was handcuffed, Leo was not permitted to further bite Plaintiff.

Under these circumstances,[6] even viewing the facts in the light most favorable to Plaintiff, he has failed to satisfy his burden to show a constitutional violation.  In other words, Plaintiff has not shown that deploying Leo was constitutionally unreasonable.  Given the numerous warnings, Plaintiff's history of fleeing, his flight from the officers on the instant day, and the potential danger to officers and bystanders of a prolonged chase through a residential neighborhood which included Plaintiff jumping on roofs and running through backyards, deploying Leo was a reasonable choice.  Moreover, Plaintiff has not established a constitutional violation subsequent to Leo's deployment.  When Leo left Defendant Aguilar's side to jump the wall into the yard where he

---

[6] Defendants further argue that they did not use excessive force because Plaintiff posed an immediate threat to the safety of officers and the community.  Defendants make several arguments.  First, they assert that Plaintiff had an outstanding warrant relating to an aggravated battery charge, a violent crime.  *Doc. 65* at 6.  However, there is conflicting evidence on this charge.  Taking the facts in the light most favorable to Plaintiff, the warrant related to a larceny charge, a nonviolent crime.  *See doc. 56-2*.  Therefore, it cannot support Defendants' argument that Plaintiff posed a threat to the safety of the community.  Next, Defendants rely on the fact that Plaintiff was high on heroin and methamphetamines during the incident and was on his way to confront a stranger.  *Doc. 65* at 6.  However, Defendants were not aware of these facts at the time, and they do not indicate that they observed any erratic or threatening conduct from Plaintiff.  We must view the facts of this case from the perspective of officers on the scene, "in light of the facts and circumstances confronting them."  *Graham*, 490 U.S. at 397.  Facts unknown to the officers cannot form the basis of a determination that their actions were reasonable.  *Phillips v. James*, 422 F.3d 1075, 1081 (10th Cir. 2005) ("[W]e agree that the only factors that can reasonably be considered are those known to the officers prior to making the disputed decision.").  Therefore, Plaintiff's intoxication does not support Defendants' argument that Plaintiff posed a threat to the safety of the community.  For these reasons, the Court did not consider these "facts" when determining reasonableness.

detected Plaintiff's scent, Defendant Aguilar immediately followed. Officer Aguilar was always close enough to Leo for Leo to be able to hear any verbal commands. Leo was not out of Officer Aguilar's sight for more than ten seconds. The longest Leo's bite could have lasted was twenty seconds and Officer Aguilar ended it ten seconds after he reached Plaintiff and immediately upon Plaintiff's handcuffing. Plaintiff alleges that he was in the act of surrendering when Leo bit him, but Defendant Aguilar had no way of knowing this fact. When Defendant Aguilar approached Plaintiff, Plaintiff was lying face down, but it is unclear whether he was already on the ground or was taken down by Leo. In light of Plaintiff's history of evasion both before and during the subject incident, it was reasonable for Defendant Aguilar to believe that Plaintiff had still been fleeing and would continue to flee if given the opportunity. Therefore, it was reasonable for Defendant Aguilar to wait until other officers were able to handcuff Plaintiff before commanding Leo to let go.

**B. In the Alternative, Defendant Aguilar Is Entitled to Summary Judgment Because Plaintiff Has Not Established that Any Constitutional Violation Was Clearly Established.**

Even assuming that Plaintiff had established a constitutional violation, he has utterly failed to demonstrate that the violation was clearly established. As noted above, qualified immunity protects officials as long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White*, 137 S. Ct. at 551 (citations and quotations omitted). A clearly

established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al–Kidd*, 563 U.S. at 741. "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Importantly, the Supreme Court has recently and frequently reminded [lower courts] that we can't define clearly established law at a high level of generality." *Bishop v. Szuba*, 739 F. App'x 941, 944 (10th Cir. July 12, 2018) (unpublished) (citations and quotations omitted). Instead, the "'clearly established' standard requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. … This requires a high 'degree of specificity.' … A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Wesby*, 138 S. Ct. at 590 (citations omitted). Consequently, the clearly established inquiry is conducted in light of the specific factual context of the case, not as a broad general proposition. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also White*, 137 S. Ct. at 552.

To put this approach into concrete terms, it is useful to consider the proper

framing of the inquiry in a few recent cases. In *Mullenix*, the "Fifth Circuit [had] held that [the officer] violated the clearly established rule that a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.'" 136 S. Ct. at 308–09. The Supreme Court emphatically rejected this formulation of the right as far too general. *Id*. Instead, the Court presented the correct formulation as follows:

> In this case, [the officer] confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road. The relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances "beyond debate."

*Id*. at 309. The importance of the factual context to the formulation can also be seen in *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2561 (2018), where the Tenth Circuit framed the relevant inquiry as involving "a scenario in which (1) officers involved in a legitimate investigation obtain consent to enter a private residence and (2) while there, ultimately cite an individual for violating the law but (3) in the interim, interrupt their investigation to order the individual to stop engaging in religiously-motivated conduct so that they can (4) briefly harass her before (5) issuing a citation." *See also Bishop*, 739 F. App'x at 945 (formulation of the right cannot "fail[] to discuss the 'particularized' facts of th[e] case.").

After laying out the factual circumstances in a sufficiently specific fashion, the court must determine whether the official's conduct violated a clearly established rule.

"To make this determination, we consider either if courts have previously ruled that *materially similar conduct* was unconstitutional, or if a general constitutional rule already identified in the decisional law [applies] with *obvious clarity* to the specific conduct at issue." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016) (emphasis and alteration in original) (quotation and citation omitted). In this circuit, the relevant precedent must come from the Supreme Court, the Tenth Circuit, or from the clearly established weight of authority from other courts. *See Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010); *see also Wesby*, 138 S. Ct. at 589–90 (To be clearly established, a legal principle must be "dictated by controlling authority or a robust consensus of cases of persuasive authority.") (internal quotations omitted). With these standards in mind, the bare minimum of material undisputed facts in the instant case are as follows: (1) Plaintiff fled the police in an encounter that occurred in a residential neighborhood during the daytime, jumping into private yards and onto roofs to evade capture; (2) Officers gave several verbal warnings to surrender or the dog would be released such that the Plaintiff would hear the warnings; (3) Plaintiff did not surrender prior to the release of the dog; (4) the dog apprehended Plaintiff and bit him for a relatively short period of time until officers arrived and placed Plaintiff in handcuffs; and (5) as soon as Plaintiff was handcuffed, the dog was not permitted to further bite Plaintiff.

To satisfy this high standard, Plaintiff relies exclusively on the *Graham* factors. Plaintiff simply states that the "*Graham* factors that police officers are to consider before

using force have been in place since 1989, well before the occurrence of this incident."

*Doc. 62* at 15.  But, as the Tenth Circuit has made clear that in typical cases, *Graham*

"merely instructs us regarding 'general principles of the Fourth Amendment'—that is,

overarching concepts that the Supreme Court has said do 'not [render] obvious ... that

the conduct of the officer[] in this case violated the Amendment.'"  *A.M. v. Holmes*, 830

F.3d 1123, 1153 (10th Cir. 2016) (quoting *Wilson v. Layne*, 526 U.S. 603, 615–16 (1999))

(alterations in original).  Plaintiff cites not a single case in which the use of a police dog

to apprehend a fleeing suspect was found to be a constitutional violation, let alone a

case remotely similar to the instant one as outlined above.  Having not done so, Plaintiff

has failed to meet the burden the qualified immunity defense places on him.  *See, e.g.,*

*Rojas v. Anderson*, 727 F.3d 1000, 1005–06 (10th Cir. 2013).  Of course, as seen in the

Court's analysis, the use of police dogs has been found to be constitutionally excessive

in some cases.  However, each of the cases discovered by the Court is materially distinct

from the facts in this case.  As such, they certainly do not place the conclusion that

Defendant Aguilar acted unreasonably in these circumstances "beyond debate."

*Mullenix*, 136 S. Ct. at 309; *see, e.g., Crall v. Wilson*, 769 F. App'x 573, 577 (10th Cir. 2019)

(unpublished) (citing *Marquez*, 399 F.3d at 1221, and finding no clearly established

constitutional violation where police dog was deployed after a warning).  Indeed, as

explained above, they lead this Court to conclude that no constitutional violation

occurred.  Consequently, Plaintiff has failed to establish that any constitutional violation

which might have occurred was clearly established.

### C. Defendant Gurule Is Entitled to Summary Judgment Because There Was No Constitutional Violation that Required Defendant Gurule's Intervention.

Defendant Gurule asserts that he cannot be held liable for the use of force in this case because "he was not the dog handler and had no personal involvement in the use or control of police service dog Leo." *Doc. 56* at 8. Plaintiff asserts that Defendant Gurule is liable for his "failure to intervene to stop Defendant Aguilar from using excessive force." *Doc. 62* at 17–18. Because Defendant Gurule was Officer Aguilar's superior and the "incident commander" on the scene, Plaintiff argues, he had the ability to prevent or stop the use of force in this case. *Id.* at 18.

"[A] law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (quoting *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996)). In *Booker*, the Tenth Circuit found that an officer who is "present and observe[s] the entire use of force" may be held liable for another's excessive force if the officer "could have prevented or stopped" it. *Id.* at 422–23. The Tenth Circuit has had occasion to consider a failure to intervene in the context of police dog bites. *Savannah v. Collins*, 547 F. App'x 874 (10th Cir. 2013) (unpublished). In *Savannah*, the plaintiff's claim against an officer other than the dog handler was dismissed because he failed to allege that the officer had the ability to control the dog and also had sufficient time to

intervene.  *Id.* at 876–77.

Because Defendant Aguilar's deployment of Leo was not a constitutional violation, there is no basis to find that Defendant Gurule committed a constitutional violation.[7]

### D. Defendant City of Clovis Is Entitled to Summary Judgment Because Plaintiff Cannot Establish Municipal Liability.

Plaintiff's municipal liability claim fails on at least three independent bases. Municipalities cannot be held liable for the acts of their employees under 42 U.S.C. § 1983 on the basis of a *respondeat superior* theory.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978); *see also Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Instead, "[a] plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).  Therefore, a "municipality may not be held liable where there was no underlying constitutional violation by any of its officers."  *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also*

---

[7] Even if there were a constitutional violation in this case, Plaintiff has presented no evidence to suggest that Defendant Gurule had any ability to give Leo commands or otherwise control him.  Defendants, on the other hand, have presented evidence that Defendant Aguilar alone received special training to handle and give commands to Leo.  Thus, Defendant Gurule's ability to intervene and stop the force in this case was necessarily limited to orders he could have given to Defendant Aguilar.

*Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155–56 (10th Cir. 2001) (applying the rule of

*Heller* to failure-to-train claim).  The Court has found that no constitutional violation has

occurred and thus Plaintiff fails to satisfy the first element.

Moreover, in order to meet the second element of his burden, a plaintiff must

"identify a government's policy or custom that caused the injury."  *Schneider v. City of*

*Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal quotations and

citation omitted).  An official policy or custom may take different forms.  *See Cacioppo v.*

*Town of Vail*, 528 F. App'x 929, 931–32 (10th Cir. 2013) (unpublished).  Specifically, "[a]

challenged practice may be deemed an official policy or custom for § 1983 municipal-

liability purposes if it is a formally promulgated policy, a well-settled custom or

practice, a final decision by a municipal policymaker, or deliberately indifferent training

or supervision."  *Schneider*, 717 F.3d at 770.  For liability to attach, the plaintiff must

demonstrate a "direct causal link between the custom or policy and the violation

alleged."  *Hollingsworth v. Hill*, 110 F.3d 733, 742 (10th Cir. 1997) (internal citations

omitted).  However, Plaintiff does not assert any deficiency in CPD's policy on police

service dogs.  Nor does Plaintiff dispute that Defendant Aguilar underwent 200 hours of

training as a police dog handler.  Rather, Plaintiff argues that Defendant Aguilar acted

contrary to CPD's policy. Therefore, CPD's policy cannot be said to have caused the alleged constitutional violation.[8]

Finally, even assuming a constitutional violation which was caused by a policy, a plaintiff is then required to show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* "But a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017) (citation and quotation omitted); *see also Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) ("[W]e agree with the Second Circuit and several district courts that a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.") (citing *Townes v. City of New York*, 176 F.3d 138, 143–44 (2d Cir. 1999) and other cases). As explained above, Plaintiff has failed to establish that, even assuming a constitutional violation occurred, it was clearly

---

[8] In his briefing, Plaintiff claims that Defendant Aguilar has consistently violated the Department's policies on the use of his police dog. *Doc. 62* at 18-19. Therefore, he argues that the failure to investigate and/or discipline him for those violations constitutes an implicit policy permitting excessive force. *Id*. Assuming such would be sufficient for a policy which could support municipal liability, Plaintiff fails to point to any evidence supporting his premise. *See id*. (citing *doc. 62-4* at 10-11 (passing reference to an "incident" with "Dan Lucero" without any underlying facts)). Without such evidence, the premise and the "implicit policy" argument fail. On a related note, Plaintiff's briefing states that "Defendants' motion for summary judgment is premature" because of outstanding discovery related to Defendant Aguilar's personnel file and disciplinary history. *Id*. at 19. However, Plaintiff's request for additional discovery time does not pass muster under Rule 56(d) which requires an attorney's "affidavit or declaration that, for specified reasons, [a party] cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see, e.g. Allen v. Sybase, Inc.*, 468 F.3d 642, 662 (10th Cir. 2006) (citing *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1522–23 (10th Cir. 1992)).

established.  As such, the municipality cannot have acted with deliberate indifference with respect to its relevant policy.  Consequently, Plaintiff cannot meet this final requirement for municipal liability.  For each of these reasons, Plaintiff's municipal liability claim is subject to summary judgment.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment on each of Plaintiff's claims.  Therefore, Plaintiff's complaint is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**